Sealed

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____

FEDERAL TRADE COMMISSION, )
            Plaintiff, )
            v. )
DIGITAL INCOME SYSTEM, INC., )
   a Florida corporation, )

DEREK FOLEY, aka Derek Jones, )
   individually and as an owner, )
   officer, and/or manager of )
   Digital Income System, Inc. )

WILLIAM FOLEY, individually and )
   as an owner, officer, and/or )
   manager of Digital Income )
   System, Inc., )

CHRISTOPHER BRANDON FRYE, )
   Individually, )

JENNIFER HEDRICK, )
   Individually, and )

KAITLYN SCOTT, )
   Individually, )

            Defendants. )

FILED BY _____ D.C.
NOV 16 2020
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**CERTIFICATION AND DECLARATION OF PLAINTIFF'S COUNSEL
HAROLD KIRTZ IN SUPPORT OF: (1) PLAINTIFF'S *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER, ASSET FREEZE, AND OTHER EQUITABLE
RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION
SHOULD NOT BE ENTERED; AND (2) PLAINTIFF'S *EX PARTE* MOTION TO SEAL**

I, Harold Kirtz, declare as follows:

1. I am over eighteen years of age and am a citizen of the United States. I am one of the attorneys representing the Federal Trade Commission ("FTC") in this action against Defendants Digital Income System, Inc. ("Corporate Defendant"), and Derek Jones Foley, William J. Foley, Christopher Brandon Frye, Jennifer Hedrick, and Kaitlyn Scott ("Individual Defendants"), individually and, and for Derek Jones Foley and William J. Foley, as owners and officers of the Corporate Defendant.

2. I am licensed to practice law in the States of Georgia and South Carolina and am certified to practice in this Court on behalf of the FTC pursuant to Rule 4(d) of the Court's Special Rules Governing the Admission and Practice of Attorneys (Special Bar No. A5500743). My business address is 225 Peachtree Street, Suite 1500, Atlanta, Georgia 30303. The following statements are within my personal knowledge, and if called as a witness, I could competently testify thereto.

3. I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1746 in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, Immediate Access, and Other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO Motion") and in support of the FTC's request that the proposed Temporary Restraining Order ("TRO") be issued without notice to Defendants. I also submit this certification in support of the FTC's *Ex Parte* Motion to Seal ("Seal Motion"), filed contemporaneously with the TRO Motion.

4. Pursuant to Rule 65(b)(1), this Court may issue a TRO without notice to Defendants if the facts show that immediate and irreparable injury will result to the applicant if notice is given and if counsel "certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b). The FTC has no information or belief as to the identity of counsel representing Defendants as to the allegations in the Complaint. For the reasons stated below, the FTC has not provided Defendants with notice of the filing of this action or the TRO Motion. The interests of justice require that these filings be heard *ex parte*.

5. The issuance of a non-noticed *ex parte* TRO is appropriate to serve the "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *See Ogangi Corp. v. Anzola*, No. 19-23118-CIV, 2019 WL 7643428, at *2 (S.D. Fla. July 30, 2019); *Louis Vuitton Malletier, S.A. v. Ivonlineoutlet.com*, No.

1

17-62403-CIV, 2018 WL 4778195, at *2 (S.D. Fla. Feb. 12, 2018); *VIP Cinema, LLC v. Eurokeyton S.A.*, No. 12-62164-CIV, 2012 WL 5398672, at *2 (S.D. Fla. Nov. 2, 2012) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974)).

## DEFENDANTS' DECEPTIVE AND ILLEGAL PRACTICES

6. The evidence set forth in the TRO Motion and supporting memorandum and exhibits, filed concurrently herewith, demonstrates that Defendants have engaged in deceptive and unlawful practices in connection with the marketing and sale of purported money-making opportunities.

7. Consumers that get involved with Defendants are looking for ways to supplement their income or to earn money while they have to stay at home. Defendants offer what they claim to be a way to make substantial income with a system that works on autopilot. Defendants advertise that the company does all of the work; the consumers need only purchase their membership in the company in order to make money. The company finds the leads for the consumer, pursues the leads, makes the sales presentations, and closes the sales, thereby making money for the company and the consumer. However, many consumers earn little or no money. Consumers' requests for refunds are ignored or dismissed.

8. Digital Income System, Inc. ("DIS") has a website that offers "A Fully-Automatic System for Generating Online Income: Digital Income System is an integrated all-in-one marketing solution for generating stable online income through the use of done-for-you traffic, marketing automation, and sales force crowdsharing." The DIS website makes the following claims about how much money consumers can expect to earn through DIS:

   a. "Consumers will earn between $500 and $12,500 per sale."
   b. "You can become very wealthy."
   c. "Each time we close a sale on your behalf, we send a huge 50% commission check straight to your doorstep."
   d. "An amazingly simple way to generate an extra $500 all the way up to an extra $12,500 or more in steady income."
   e. "With this unique opportunity, you can generate payments made to you without the steep learning curve or tedious hard work that the other programs make you do. . . . With our Digital Income System, you'll never have to sell anything to anyone. That is why our system is working for people from all walks of life."

  f. "The number one way to have a great financial future is to make a lot of money right now. . . . Focus a few minutes a day and generate $500 to $12,500 or more in steady income with our easy three-step system."

9. The Owner Defendants and the Promoter Defendants repeat these same misrepresentations many times over to convince consumers to purchase membership. Once the consumers are convinced to buy, in many instances they discover that they do not earn money on "autopilot," as advertised. Many consumers do not make the substantial earnings that they are told by Defendants that they will make, and, in fact, many consumers make no money at all.

10. Defendants' illegal practices violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and the FTC's Business Opportunity Rule ("Biz. Op. Rule"), 16 C.F.R. Part 437.

## THE PROPOSED TRO

11. The proposed TRO would temporarily: (1) enjoin Defendants from engaging in deceptive acts and practices in connection with the marketing and sale of purported money-making opportunities and from violating Section 5 of the FTC Act and the Biz. Op. Rule; (2) freeze Defendants' assets to preserve them for potential restitution to victims; (3) enjoin Defendants and third parties from destroying or concealing documents, and from transferring, concealing or otherwise disposing of assets; (4) appoint a receiver; (5) require Defendants to identify all assets, repatriate all assets located outside the U.S., provide certain business information, and provide information relating to their current financial condition; (6) grant the FTC immediate access to the Defendants' business premises and records; and (7) show cause why a preliminary injunction should not issue.

## REASONS FOR FILING *EX PARTE* AND
## FOR A TEMPORARY SEAL OF THE ENTIRE CASE FILE

12. It is proper to issue non-noticed *ex parte* TROs when proceeding *ex parte* is the "sole method of preserving a state of affairs in which the court can provide effective final relief." *See Project Vote v. Madison Cty. Bd. of Elections*, No. 1:08-cv-2266JG, 2008 WL 4445176, at *7 (N.D. Ohio Sept. 29, 2008) (quoting *Adobe Sys., Inc. v. S. Sun Prods., Inc.*, 187 F.R.D. 636, 639 (S.D. Cal. 1999)); *Adobe Sys., Inc. v. S. Sun Products, Inc.*, 187 F.R.D. 636, 639 (S.D. Cal. 1999) (quoting *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979)). For example, when a party threatens "imminent destruction of the disputed property, its removal beyond the confines of the

3

state, or its sale to an innocent third party," "giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all." *Emerging Vision, Inc. v. Glachman*, No. 10-80734-CIV, 2010 WL 3293346, at *4 (S.D. Fla. June 29, 2010) (quoting *Adobe Sys., Inc.*, 187 F.R.D. at 640 n. 3); *Adobe Sys., Inc.*, 187 F.R.D. at 640 (quoting *Vuitton*, 606 F.2d at 4). The applicant for *ex parte* relief can also support such assertions by showing that, based on past experience, defendants, or persons similar to defendants, have a history of disposing of evidence or violating court orders and, therefore, are likely to engage in such conduct. *See Glachman*, 2010 WL 3293346, at *6; *Adobe Sys., Inc.*, 187 F.R.D. at 640.

13. Courts in this and other districts in the Eleventh Circuit have granted numerous such non-noticed *ex parte* TROs, which, where appropriate, have included an asset freeze, appointment of a receiver, and immediate access to business premises. *See, e.g., FTC v. Simple Health Plans LLC*, Case No. 0:18-cv-62593-DPG, Doc. 15 (S.D. Fla. Oct. 31, 2018) (*ex parte* and temporarily sealed TRO with, *inter alia*, immediate access, temporary receiver, and asset freeze); *FTC v. Pointbreak Media, LLC,* Case No. 0:18-cbv-61017-CMA, Doc. 12 (May 8, 2018) (same); *FTC v. Student Debt Doctor LLC*, No. 17-cv-61937 WPD, Doc. 4 (S.D. Fla. Oct. 2, 2017) (same); *FTC v. American Student Loan Consolidators*, No. 0:17-cv-61862-DPG, Doc. 9 (S.D. Fla. Sept. 26, 2017) (same); *FTC v. Strategic Student Solutions LLC,* Case No. 9:17-cv-80619-DIMITROULEAS, Doc. 10 (S.D. Fla. May 15, 2017) (same); *FTC v. World Patent Mktg., Inc.*, No. 17-cv-208448-GAYLES, Doc. No. 11 (S.D. Fla. Mar. 8, 2017) (same); *FTC v. Mail Tree, Inc.*, No. 15-cv-61034-COHN, Doc. No. 16 (S.D. Fla. May 19, 2015) (same); *FTC v. InboundCall Experts*, No. 14-81395-CIV-MARRA, Doc. No. 12 (S.D. Fla. Nov. 14, 2014) (same); *FTC v. Boost Software, Inc.*, No. 14-81397-CIV-MARRA, Doc. No. 13 (S.D. Fla. Nov. 12, 2014) (same); *FTC v. Centro Natural Corp.*, No. 14-23879-CIV-ALTONAGA, Doc. No. 10 (S.D. Fla. Oct. 20, 2014) (same); *FTC v. Partners in Healthcare Assoc., Inc.*, No. 14-cv-23109-SCOLA, Doc. No. 9 (S.D. Fla. Aug. 25, 2014) (same); *FTC v. FMC Counseling Servs., Inc.*, No. 14-61545-CIV-ZLOCH, Doc. No. 15 (S.D. Fla. Jul. 7, 2014) (same).

14. To the best of the FTC's knowledge, Defendants are not aware that the FTC has uncovered evidence of their legal violations or that the FTC seeks redress from them. But there is ample reason to believe that Defendants have the motivation and opportunity to conceal and dissipate assets and destroy evidence if they prematurely learn of the FTC's action.

15. Defendants operate a business that is permeated by fraud and that relies on deceiving consumers, and they continue making their misrepresentations despite numerous complaints from consumers. After telling consumers how easy it is to make money by becoming members in DIS, Defendants ignore the pleas of consumers to help them when the consumers realize that DIS does not earn them any money. Using a commercial mail center, a UPS store, as the corporate address helps hide their location and existence. In addition, bank records show that the Owner Defendants routinely use corporate funds by taking out substantial amounts of money for themselves. Because of the pervasive nature of Defendants' law violations, the FTC believes there is significant risk that Defendants may dissipate assets and destroy evidence if they receive notice of the FTC's intention to seek relief for consumers.

16. The ongoing nature of Defendants' illegal practices, coupled with the Owner Defendants' use of corporate assets for personal purposes, demonstrates a likelihood that Defendants will dissipate or conceal assets and destroy or conceal evidence of their unlawful conduct without prompt entry of the asset freeze and the evidence preservation provisions of the proposed restraining order. This would cause immediate and irreparable harm to the FTC's ability to achieve effective final relief for consumers, including monetary redress or restitution and disgorgement of ill-gotten funds.

17. It has been the FTC's experience that Defendants involved in deceptive acts and practices, who receive notice of the filing of an action by the FTC, or of the FTC's intent to file an action, often attempt to undermine the FTC's efforts to preserve the status quo by immediately dissipating or concealing assets or destroying documents. The following examples, provided on information and belief, have occurred in this District and illustrate the FTC's concerns:

    a. In *FTC v. Prime Legal Plans LLC*, No. 12-61872 (S.D. Fla. 2012), the FTC obtained an *ex parte* TRO with an asset freeze and appointment of a receiver. Within hours of learning of the action, the defendants moved approximately $2 million to bank accounts belonging to several non-party individuals, at least $200,000 of which were never recovered.

    b. In *FTC v. Khalilian*, No. 10-21788 (S.D. Fla. 2010), the FTC obtained an *ex parte* TRO freezing the assets of defendants operating a telemarketing scam. After being served with the TRO, one of the defendants, Fred Khalilian, directed his

5

employee to withdraw $71,000 in cash from a frozen corporate account. While conducting an asset deposition of Khalilian's fiancé, the court-appointed receiver learned that individuals were using a rented truck to remove tens of thousands of dollars' worth of furniture and other valuables from a luxury apartment occupied by Khalilian and his fiancé and paid for with proceeds of the scam. The receiver immediately ended the deposition and, with the assistance of law enforcement, prevented Khalilian's associates from absconding with the property.

    c. In *FTC v. American Entertainment Distributors, Inc.*, No. 04-22431 (S.D. Fla. 2004), this Court entered an asset freeze that froze the assets of ten corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank. Because the asset freeze had been in place, the FTC was able to compel the individual defendant to return the money.

    d. In *FTC v. Access Res. Servs., Inc.*, No. 02-60226 (S.D. Fla. 2002), a defendant who learned about the FTC's action attempted to dissipate $579,600 by paying off the mortgage on his residence, which was protected by Florida's homestead protection laws.

18. Examples from other Districts include the following:

    a. In *FTC v. Critical Resolution Mediation LLC*, Case No. 1:20-cv-03932-JPB, Docs. 11 and 14) (N.D. Ga. Sept. 30, 2020), the FTC sought and obtained an *ex parte* TRO with an asset freeze. An officer of the corporate defendant presented a check to withdraw $120,000 from a corporate bank account about one hour after the TRO had been signed by the judge. That issue is still being argued in court.

    b. In *FTC v. Laptop and Desktop Repair, LLC*, No. 1:16-cv-3591-AT (N.D. Ga. 2016), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After learning that the TRO had been granted, one defendant immediately withdrew money and transferred it to a non-defendant limited liability company. On the day that the court entered a preliminary injunction with an asset freeze, the same defendant withdrew $103,369 from his personal online brokerage account and transferred the money to another personal account.

    c. In *FTC v. Asset & Capital Mgmt. Grp.*, No. 8:13-cv-01107-DSF-JC (C.D. Cal. 2013), fully one week after the Court granted, and the FTC served on all defendants, an *ex parte* TRO that froze defendants' assets and appointed a Receiver, the Receiver identified an additional business site that defendants had failed to disclose. The undisclosed site turned out to be the defendants' headquarters and contained extensive business records, including corporate and tax records, bank statements, and personnel files for dozens of defendants' entities. The Receiver arrived at the site unannounced, after receiving repeated assurances from defendants that they had disclosed all of their business locations. He found a defendant and his colleague carrying folded bankers' boxes from their car to the site, clearly intent on removing materials from the premises. When the Receiver gained entry to the site, he found evidence that desktop computers and records recently had been removed. The FTC subsequently learned that more than 60 servers and extensive records had been taken.

    d. In *FTC v. E.M.A. Nationwide, Inc.*, No. 1:12-cv-2394 (N.D. Ohio 2012), the FTC filed for an *ex parte* TRO and corporate asset freeze, but the court required that notice be given to the defendants. Within a week of obtaining notice, the defendants had withdrawn more than $152,000 from a corporate bank account.

    e. In *FTC v. Transcontinental Warranty Inc.*, No. 09-cv-2927 (N.D. Ill. 2009), the Court granted the FTC's motion for a temporary restraining order freezing defendants' assets and appointing a receiver. However, when the receiver and counsel for the FTC arrived at the corporate defendant's premises pursuant to the court's order, hundreds of folders with labels indicating that they contained records of defendants' most recent transactions were found empty. In addition, five computers, including that of the corporate defendant's CFO, were allegedly stolen the night before the receiver and counsel for the FTC arrived at the premises, and various third-party trade debtors of the corporate defendant froze payments due to the corporate defendant, which resulted in extensive litigation over these assets and ultimately cost the receivership estate tens of thousands of dollars.

 f. In *FTC v. Global Marketing Grp., Inc.*, No. 06 CV 2272 (M.D. Fla. 2006), the court granted the FTC's *ex parte* motion for a temporary restraining order with an asset freeze, which the FTC served on banks known to hold accounts of the defendants. After being served with the order, one of the defendants successfully withdrew over $500,000 from accounts previously unknown to the FTC. Most of these funds were wired to offshore bank accounts. This defendant was ultimately held in contempt of court and fled the country after failing to appear at a show cause hearing.

 g. On August 9, 2006, in *FTC v. Connelly*, SA CV-06-701 DOC (RNBx) (C.D. Cal. 2006), the court issued an *ex parte* TRO with an asset freeze against one defendant, but issued a noticed Order to Show Cause to two other defendants, ordering them to show cause as to why their assets should not be frozen. Having notice that the FTC sought to freeze their assets, the defendants nevertheless withdrew at least $800,000, some of which was subject to the asset freeze, and most of which was never recovered.

 h. In *FTC v. Universal Premium Servs., Inc.*, No. 06-849 (C.D. Cal. 2006), a defendant and his wife withdrew over $45,000 from their joint personal bank account, which the bank had not yet frozen, hours after he was personally served with an *ex parte* TRO that included an asset freeze. Subsequently, the defendant withdrew over $4,700 via electronic debit or check, also in violation of the TRO.

 i. In *FTC v. World Traders Ass'n*, No. 05-591 (C.D. Cal. 2005), notwithstanding an *ex parte* TRO, including an asset freeze, the lead defendants appropriated $90,459 from a frozen bank account within one day of being served with the TRO. Although the contempt resulted in subsequent criminal indictments, the money was never recovered.

 j. In *FTC v. 4049705 Canada Inc.*, No. 04-cv-4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants who were engaged in telemarketing fraud. Thereafter, the FTC filed a complaint and motion for a temporary restraining order with an asset freeze, providing notice to defendants. The FTC subsequently discovered that defendants

had made several substantial money transfers after receiving notice of the FTC's action but before the asset freeze was imposed.

k. In *FTC v. Unicyber Technology, Inc.*, No. CV 04-1569 LGB (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a temporary restraining order with an asset freeze and appointment of a receiver. Shortly after the individual defendant was served with the TRO, he called his wife, who—at his direction— violated the asset freeze by transferring $405,000 of corporate funds to her father.

l. In *FTC v. Nat'l Consumer Council*, No. SA CV-04-0474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a temporary restraining order with asset freeze and the appointment of a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on the defendants' shared network server by accessing his account through a computer under the control of the corporate defendant that was not under the receivership.

m. In *FTC v. Check Investors, Inc.*, No. 03-cv-02115 (D.N.J. 2003), the Court denied the FTC's request to have its motion for temporary restraining order with asset freeze heard on an *ex parte* basis and, instead, required the FTC to give the defendants notice. After the noticed hearing, the Court granted the FTC's motion and entered a temporary restraining order with an asset freeze. Bank records showed that the day of the TRO hearing, one of the individual defendants accessed a safe deposit box. Other records showed that the defendant had purchased $649,309.03 in gold, bullion, and certificates. When the safe deposit box was inventoried by the FTC and the defendants' counsel after entry of the TRO, the box was found to contain only approximately $192,714.24 in gold. The remaining $456,594.79 in gold was never recovered.

n. In *FTC v. Assail Inc.*, No. 03-007 (W.D. Tex. 2003), the court issued an *ex parte* TRO, including an asset freeze. The lead defendant nonetheless transferred $200,000 within hours of being served with the TRO, which, after contempt proceedings and a lengthy appeal, the defendant was required to repay.

o. In *FTC v. QT, Inc.*, No. 03-3578 (N.D. Ill. 2003), defendants, after notice of a TRO with an asset freeze, withdrew and transferred more than $2 million dollars

9

from banks that had not yet received notice of the asset freeze.

p. In *FTC v. Physicians Healthcare Dev., Inc.*, No. CV-02-2936 (C.D. Cal. 2002), the FTC provided notice of filing an *ex parte* action to the individual defendants. The court issued a TRO with asset freeze and prohibition against destruction of records, and the defendants were served with the TRO the same day. The next day when FTC staff went to the defendants' offices to take control of the business records, they found that business records, including computers, had been removed from the premises or shredded. Witnesses advised FTC staff that, on the day of the hearing on the TRO, they observed defendants' employees removing computers and other items from the business premises. The records that were removed were never recovered.

19. In the FTC's experience, defendants may also learn about a case against them from a docket monitoring service. For example, in *FTC v. Wazzu Corp.*, No. cv-99-13114 (C.D. Cal. 1999), when FTC staff arrived at the defendants' business premises to serve a temporary restraining order, it discovered that defendants had already learned about the action against them from a monitoring service to which their counsel subscribed. The monitoring service would not have learned of the action at the time of filing if the file and docket had been temporarily sealed.

20. For all the above reasons, as contemplated by Fed. R. Civ. P. 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the dissipation of assets, and from the concealment, transfer, or destruction of Defendants' records, if Defendants receive advance notice of the FTC's Complaint and TRO Motion. Thus, it is in the interests of justice that this Court grant the FTC's *ex parte* TRO Motion and *ex parte* Motion for Temporary Seal of the Case File.

21. The FTC has not made a previous application for similar relief in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of November, 2020, in Atlanta, Ga.

*/s/ Harold E. Kirtz*
HAROLD E. KIRTZ
Florida Special Bar No. A5500743
Federal Trade Commission
225 Peachtree Street, Suite 1500
Atlanta, Georgia 30303

770-789-9378
hkirtz@ftc.gov
Attorney for Plaintiff
FEDERAL TRADE COMMISSION